**[Cite as *In re L.C.*, 2025-Ohio-193.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | |
|---|---|
| IN RE: L.C. | : |
| | : |
| | : |
| | :    C.A. No. 2024-CA-47 |
| | : |
| | :    Trial Court Case No. P0009180 |
| | : |
| | :    (Appeal from Common Pleas Court- |
| | :    Juvenile Division) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on January 24, 2025

. . . . . . . . . . .

L.M., Pro Se Appellant

R.C., Pro Se Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Father, pro se, appeals from a judgment of the Greene County Court of Common Pleas, Juvenile Division, which overruled three motions related to the court's child support order and its enforcement. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} In May 2013, Mother filed a complaint for paternity, alleging that Father was the biological father of L.C., who was born in 2011.  Mother sought genetic testing to establish L.C.'s paternity.  A magistrate granted the motion and set a final non-contested hearing for paternity for October 1, 2013.  Service was attempted on Father by certified mail, but the documents were returned as unclaimed.  Service was then sent by ordinary mail.

{¶ 3} Mother was the sole witness at the October 1, 2013 hearing.  Based on her testimony, the magistrate orally ruled that Mother and Father were L.C.'s biological parents, that Father would be added to L.C.'s birth certificate, and that Father would be ordered to pay child support.  Father arrived late for the hearing and learned of the outcome.

{¶ 4} On October 28, 2013, the magistrate filed a written entry finding that Father was the biological father of L.C. and ordered Father to pay child support.  Father objected to the magistrate's decision and requested DNA testing.  The trial court ordered Father and L.C. to submit to genetic testing and set a hearing on the objections; it is unclear whether DNA testing was ever performed.  Nevertheless, at the hearing, Father indicated that he was only challenging the amount of child support.  In its January 29, 2014 judgment, the trial court adopted the magistrate's decision except as to the amount of child support, which it reduced to $479.28 per month, plus a two percent processing fee. Father did not appeal the trial court's judgment.

{¶ 5} Approximately nine years later, on February 23, 2023, the Greene County

Child Support Enforcement Agency (CSEA) filed an Administrative Adjustment Recommendation that Father's child support be modified to $1,042.34 per month, which it supported with a computation worksheet. The magistrate approved the modification, and the trial court adopted the magistrate's decision the same day. Father, who no longer lived in Ohio, objected to the trial court's judgment. He also moved for a decrease in his child support obligation because, as of March 13, 2023, he was no longer employed. The magistrate overruled Father's objection as untimely but scheduled a hearing on his motion to modify child support. Father claimed that the court lacked personal jurisdiction over him and sought to appear by special appearance.

{¶ 6} In a May 18, 2023 decision, the magistrate concluded that the court had personal jurisdiction over Father and denied Father's motion to modify child support due to Father's failure to proceed with his case-in-chief at the hearing. Father filed belated objections, which the trial court rejected as untimely.

{¶ 7} In July 2023, Father moved to dismiss the case, claiming that the trial court lacked personal jurisdiction over him and that other errors had occurred. He also moved to terminate child support and for legal custody of L.C. The complaint for legal custody was transferred to Clark County, where Mother and L.C. resided.

{¶ 8} In August 2023, the trial court addressed Father's motion for limited appearance, his motions to dismiss, and other motions. The trial court rejected the motions, finding that it had subject matter jurisdiction over the case and personal jurisdiction over Father.

{¶ 9} Over the next several months, Father filed numerous motions, notices, and

objections. He continued to challenge the court's jurisdiction, claimed that judgments entered after October 1, 2013 were void, asserted that his due process rights had been violated, argued that he did not consent to acknowledgment of paternity and voluntary payment of child support, and raised other alleged errors by the trial court. Father repeatedly sought summary judgment on his arguments and the dismissal of the case. The trial court overruled his motion, notices, and objections on October 20, 2023 (addressing Father's September filings), December 7, 2023 (addressing Father's November 2, 2023 filings), and December 14, 2023 (addressing Father's December 11, 2023 filings). Father did not appeal the trial court's judgments.

{¶ 10} Sometime in late 2023, CSEA apparently made a determination that Father was in default under a support order. In February 2024, CSEA notified Father that his driver's license could be suspended by the Bureau of Motor Vehicles (BMV) due to the default. The notice indicated that he may be able to avoid the suspension of his license by contacting CSEA by February 15. Father emailed CSEA on the morning of February 15, and the same day, CSEA responded that it had mailed him a modification application to return. Father's Ohio driver's license was suspended by the BMV, effective February 23, 2024. In April 2024, CSEA sent financial institutions associated with Father a notice that the monies and credits in the account were to be restricted until the institution received either a withdrawal directive or an order to remove the access restriction. CSEA also sent withdrawal notices for his arrearage of $6,258.69.

{¶ 11} On April 26, 2024, Father filed "objections to an administrative action" in the trial court, attaching the asset restriction notices, withdrawal notices, and other

documents. Approximately a month later, on May 28, 2024, Father filed a motion to dismiss the case due to violations of his due process rights under the Fourteenth Amendment to the United States Constitution. He indicated that he had filed objections to the administrative action with the clerk of the juvenile court in December 2023 and January 2024, but the documents had not been entered. Father further stated that CSEA had initiated bank levies in December 2023 and January to May 2024 without his consent and had not allowed a hearing on his objections. Finally, Father alleged that CSEA suspended his driver's license without allowing a poverty hearing. Contemporaneously with his motion to dismiss, Father also filed Notices of Denial of Rights under Color of Law, claiming violations of 18 U.S.C. 242, 28 U.S.C. 2071, 28 U.S.C. 2076, and/or 42 U.S.C. 1983 by various public employees allegedly involved in the case.

{¶ 12} On June 21, 2024, the trial court overruled Father's April 26 and May 28, 2024 filings. First, the court found that a final child support order, which Father did not appeal, had been entered in 2014, and thus Father's motion to dismiss was untimely. Second, the court stated that Father's remedy regarding the account access restriction and withdrawal directive was to object to CSEA's actions by filing a written request for an administrative hearing with CSEA. Finally, the court concluded that it lacked jurisdiction "to hear Federal claims such as those alleged in [Father's] pleadings."

{¶ 13} Father appeals from the trial court's June 21, 2024 judgment. Neither Mother nor CSEA has filed a responsive brief.

## II. Appellate Review

{¶ 14} In his appellate brief, Father provides seven "questions presented." He

raises: (1) did the juvenile court have jurisdiction; (2) was there a valid enforceable order; (3) did CSEA follow its procedural guidelines in opening the case; (4) did CSEA establish paternity; (5) did the juvenile court lack jurisdiction to hear federal claims; (6) do citizens have equal rights under the law; and (7) can CSEA violate due process?

**A. Res Judicata**

{¶ 15} At the outset, we conclude that four of the issues that Father raises are barred by res judicata. "Under the doctrine of res judicata, a party is barred from asserting claims against a valid, final judgment that have been raised or could have been raised on appeal." *Haddox v. Haddox*, 2022-Ohio-3500, ¶ 49 (6th Dist.). "In short, the doctrine of res judicata prevents us from considering arguments that could and should have been raised during earlier appeals." *Thiery v. Thiery*, 2024-Ohio-2936, ¶ 20 (2d Dist.), citing *Chepp v. Chepp*, 2011-Ohio-4451, ¶ 15 (2d Dist.).

{¶ 16} In this case, the magistrate found that Father was the biological parent of L.C. and ordered Father to pay child support. Father objected to the decision, claiming that he had not received notice of the hearing before the magistrate and challenging paternity. The trial court ordered genetic testing and set a hearing. Father appeared for that hearing, provided an affidavit of income and expenses, and indicated that he was only challenging the amount of child support. The trial court entered a final child support order on January 29, 2014, the same day as the hearing. (The trial court and Father cite to February 14, 2014 as the date of the judgment, but the record contains no judgment on that date.) Father was served with the final judgment but did not appeal. Father also did not appeal the trial court's 2023 judgments concluding that it had both subject matter

and personal jurisdiction. Consequently, Father is precluded from now challenging the trial court's personal jurisdiction over him, the validity of the child support order, CSEA's actions in initiating the case, and Father's paternity of L.C. – all of which could have been raised in a prior appeal.

{¶ 17} Even assuming that Father's jurisdictional arguments were properly before us, we would conclude that the trial court properly exercised jurisdiction. Father and Mother were never married, and the trial court therefore had subject matter jurisdiction over Mother's complaint for paternity and child support. *See* R.C. 2151.23. Service on Father by certified mail was unclaimed, and Father was served with Mother's complaint by ordinary mail in August 2013. Although the magistrate set the October 1, 2013 hearing prior to service, Father appeared (albeit belatedly) for that hearing. Father subsequently filed an affidavit of income and expenses and appeared for the trial court's January 29, 2014 hearing on his objections to the magistrate's decision. On this record, Father's voluntary participation after service waived any personal jurisdiction challenge. The fact that Father later moved to another state did not deprive the trial court of continued personal jurisdiction over him.

{¶ 18} Father's first, second, third, and fourth "questions presented" are overruled.

### B. Juvenile Court's Jurisdiction over Federal Questions

{¶ 19} Father's fifth, sixth, and seventh "questions presented" raise general questions of federal law. Father, in essence, asserts that CSEA's support enforcement actions violated his due process rights, and he challenges the trial court's determination that it "lack[ed] jurisdiction to hear Federal claims such as those alleged in [Father's]

pleadings."

{¶ 20} R.C. Chapter 3123 provides procedures for when a child support enforcement agency identifies a default under a support order. The agency must conduct an investigation and send a notice of default to the obligor. R.C. 3123.02; R.C. 3123.03. An obligor who receives a default notice may file a written request for an administrative hearing *with the child support agency* regarding whether a mistake of fact was made in the notice. R.C. 3123.04. If a timely request for a hearing is made, the agency must conduct an administrative hearing within ten days. *Id.* After the agency makes a determination, the obligor may file a written motion for a court hearing to determine whether a mistake of fact still exists in the default notice. R.C. 3123.05. On the other hand, if the obligator fails to make a timely request for an administrative hearing, the default notice becomes a final and enforceable determination by the child support agency that the obligor is in default under the support order and of the amount of the arrearage owed as a result of the default. R.C. 3123.032; *see Harris v. Omosule*, 2010-Ohio-1124, ¶ 9 (2d Dist.).

{¶ 21} If an agency's determination of default becomes final and enforceable, the agency must issue notices requiring withholding or deduction of income or assets of the obligor. *See* R.C. 3123.06. If at least 90 days elapse after the final and enforceable determination of default and the obligor has failed to pay at least 50 percent of the total monthly obligation due through certain means, the agency may notify the obligor that a notice will be sent to the registrar of motor vehicles. See R.C. 3123.55(B). R.C. 3123.55 "empowers the registrar of the bureau of motor vehicles to impose a suspension

upon a holder of a driver's license upon receiving notice from a child enforcement agency that the holder is in default under a child support order." *State v. Walker*, 2010-Ohio-3043, ¶ 20 (5th Dist.).

{¶ 22} Father's administrative action appears to challenge, on due process grounds, the withdrawal directives for his financial accounts and the BMV's suspension of his driver's license. However, Father's attachments to those documents suggest that Father did not follow the necessary procedures to request an administrative hearing before CSEA regarding his alleged default and, consequently, it appears that no administrative hearing was held. The notice of suspension from the BMV informed Father how his license may be reinstated, but there is nothing in the record to demonstrate that Father has satisfied his child support obligation and paid the reinstatement fee.

{¶ 23} In the absence of an administrative hearing under R.C. 3123.04, Father was not entitled to a hearing before the trial court regarding CSEA's default determination. Further, under the statutory scheme, the trial court had no authority to order the CSEA to reinstate Father's driver's license. *See Harris* at ¶ 11. Notably, Father does not dispute CSEA's finding that he is in default on his child support obligation. On the record before us, the trial court properly overruled Father's objections to an administrative action based on the alleged denial of his right to due process.

{¶ 24} Father further challenges the trial court's statement that it lacked jurisdiction to hear his federal claims. Interpreted broadly, the trial court's statement could suggest that the juvenile court lacked jurisdiction to address any due process arguments. To the extent that the trial court intended such a broad interpretation, we disagree that juvenile

courts cannot hear due process claims related to the proceedings before it. *See In re Hartmier*, 2004-Ohio-5830 (2d Dist.) (declining to address constitutional challenges to R.C. 3123.53 because the obligor failed to raise the issue in the juvenile court).

**{¶ 25}** However, upon reading the trial court's entire judgment, we infer that the trial court meant that it lacked authority to address Father's specific claims, given how they were raised in the trial court. As to his federal statutory claims against various public employees, Father's filing of notices of denial of rights under color of law was not the appropriate method to raise those claims, even assuming that the juvenile court was the appropriate venue to hear them.

**{¶ 26}** Father's fifth, sixth, and seventh "questions presented" are overruled.

**{¶ 27}** Father's challenges to the child support order began with the 2023 increase in his support obligation. Nothing in this opinion precludes Father from seeking modification of his child support obligation.

### III. Conclusion

**{¶ 28}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.